Statement of the Case.
MONROE, J.
Plaintiff prosecutes this appeal from a judgment rejecting his claim for damages for an injury sustained by him while he was attempting to uncouple, or “cut off,” one of the freight cars of a moving train. He was an active man, and had been employed by defendant for about three years as depot and warehouse porter at its station at Eunice. His wages were $35 per month, and, as he could earn more than double that amount as brakeman, he repeatedly requested that he be given that position, and from time to time was seen reading defendant’s book of rules, apparently with a view of qualifying for the discharge of its duties. From time to time, also, during the summer and fall of 1910, on Sundays and perhaps other occasions, when one of the brakemen “laid off” for a day, he was assigned to his place, and finally, about the early part of December of that year, he was employed as a regular brakeman. Six or eight weeks ■later (January 20, 1911) Freight Conductor Webster, under whom he was working, had occasion, in making up his train, to move a locomotive, with five box cars attached, westward on the main track, in the yards at Eunice, through a switch, and then to back them eastward on a “passing track,” upon which he instructed plaintiff to uncouple and leave (or, in railway parlance, to “kick” or “cut off”) the end car, which was connected with its neighbor by means of automatic couplers, equipped with levers, whereby they were to be operated from the outside, so that the coupling and uncoupling could be done without subjecting the brakeman to the danger of going between the cars while they were in motion. It appears, however, that the particular lever with which plaintiff attempted to operate had become disconnected from the coupling pin, and failed to lift the pin from its place; and he tells his story o'f what then happened, as follows:
“In Eunice, in 1911, we went on the side track and got a car, and kicked it out on the main line, and we had some more to shove hack, and the conductor told me to cut the car off, and, when I reached the lever, the lever was disconnected -from the pin. I told Mr. Webster [the conductor] that the lever was disconnected from the pin, and he told me to go on and cut the car off, and I went and lifted the pin with my hand, and, walking along waiting for the train to slack, so the car would be cut off, my foot got caught in the guard rail, and got cut off, near as I can come to it. ■:= * * q. Teu the judge what you were doing when the car ran over you. A. Conductor Webster sent me in to cut off this car — 1 guess it was a little this way — and, when I grabbed the lever, I told him it was disconnected, and I hollered to him that it was, and he said, ‘Gut off the car;’ and I went in and caught the lever [meaning the pin], and I was walking along between the cars; holding the pin, and my foot got caught at place marked ‘T’ [on photograph exhibited to him], as well as I can remember. I just held on, and as soon as it stopped I fell over here, and they picked me up. * * * Q. Where was Mr. Webster at the time he told you to cut the car out? A. I think he was about 20 or 30 feet from where I was. Q. Which way? A. Towards the tank —east. * * * Q. In what direction were you walking with the going car at the time the accident happened? A. East. Q. On the north or south side ?_ A. On the north side. * * * Q. How far did you walk with the going cars after you put your hand on the coupling pin? A. To my nearest remembrance, 1 guess 1 must have walked about 10 or 12 yards, maybe farther, maybe less. * * * Q. Have you any recollection of when you stepped into that guard rail? A. My nearest recollection is when the wheel ran over my foot. Q. Did you or not get your foot fastened in the guard rail? A. The way I understand it, my foot must have gotten fastened in the guard 'rail. Q. Have you any recollection of your trying to get away from the guard rail, or get your foot out? A. I can hardly tell; I guess I must have pulled when the wheel ran over it.”
On cross-examination:
“Q. When you first went to uncouple that car and kick it back, how far was Mr. Webster from you? A. I guess about 20 or 30 feet from me, maybe farther, maybe closer. Q. Was he on the same side of the siding that you were, or on the other side? A. I understand that he was on the other side of the siding. A. You could see him? A. Yes, sir. * * * Q. How many cars were you kicking into that *611 siding? A. I don’t remember. * * * I was cutting off some cars; I don’t remember how many. * * * Q. Mr. Webster was 20 or 80 feet away from you? A. Yes, sir. * * * Q. What did you say? A. I said the lever was disconnected from the pin, and he said, ‘Go in and cut that car off; cut that car off.’ Q. And you went in and lifted the pin, and cut the car off? A. Yes, sir. * * * Q. Who gave the signal for them to stop, when you were hurt? A. I tried to give it; I don’t.know whether they stopped by that or not. I know I tried to wave it; but whether he got the signal by that I don’t know. Q. You say you lifted the pin with your right hand, and walked along about 12 yards, holding the pin m your right hand, and walking along in between the two rails, the way the train was going? A-. Yes, sir. Q. How long did you expect to walk along that way before the train stopped? A. I don’t know. Q. Whose business was it to give the signal for the train to stop? A. I could, and the conductor could. Q. Why didn’t you go out and give the signal? A. I might have given the signal. Q. Wasnt the train going on until you gave the signal to stop? A. Yes, sir. Q. Why didn’t you give a signal for the train to stop? A. I thought I did. * * * Q. The guard rail is inside the rail, and your foot was caught between the rail and the guard rail, wasn’t it? A. Yes, sir; the way I understand. * * * Q. Pete, suppose, instead of going in between those cars to uncouple them by lifting the pin, you would have signaled the engineer to stop; would he have stopped? A. I guess he would; but the conductor told me to go in and cut them off. * * * Q. You say that, when you tried to work the rod, you found that the chain was unhooked from the lever? A. Yes, sir. Q. And you informed the conductor? A. Yes, sir. Q. According to that statement, you wouldn’t have gone between the cars — you were sufficiently acquainted with the danger of doing so —if the conductor hadn’t told you to do so, after you told him that the chain was unhooked from the pin; you understand me? A. Yes, sir. Q. Is that right? If the conductor hadn’t told you to go in, you wouldn’t have gone in? A. If the conductor hadn’t told me to go in, no, sir; I don’t think I would. * * * Q. While you were talking to the conductor, and while tugging at the pin, was the car always in motion? A. Yes, sir. Q. Why didn’t you pull it out immediately, instead of running along with the car? A. I had pulled it out, but the train was still in motion; my intention in staying in there and holding the pin was so, when the engineer stopped the car, I could pull the pin out, and the car would have been cut off from the train, on the side track. Q. Could you have pulled the pin out until the train slacked up? A. I could have pulled it out whilst it was in motion; it was possible, but, as long as they were coming back, it would have dropped back, and the cars would still have been connected. Q. Then, in order to uncouple it, and for it to stay uncoupled, you had to hold it up until the engine stopped? A. Yes, sir.”
Redirect examination:
“Q. Was Mr. Webster on the same side of the track that you were on? A. He was on the opposite side; there was a flat car, and I could see Mr. Webster — the way I understand. Q. How could you see Mr. Webster if he was on the opposite side, with a flat car between you? A. A flat car is only about 4 feet high. Q. It wasn’t a box car; it was a flat car, without sides? A. Yes, sir. * * * Q. You say, over the flat car you could see Mr. Webster’s hand and body from where you were? A. Yes, sir. * * * Q. Then it was the flange of the wheel that ground your foot while it was fastened between the guard and the main rail? A. Yes, sir.”
Towards the close of the trial, plaintiff was examined by the judge as follows:
“Did you say you were facing east? A. Yes, sir. Q. Did you fall down on the track? A. No, sir; after my foot got caught, I held to the pin, and, if I had turned loose, the train would have run over me, and I waved to the engineer until he stopped, and then I fell right out on the end of the cross-ties. Q. You stayed between the cars while it was running over your foot? A. Yes, sir. Q. How in the world did you do that? A. The flange of the wheel had caught my foot between the guard rail, and, by holding the pin, I could stay in between, and as soon as the engineer stopped I rolled out on the side. Q. How far is that wheel from the end of the car? A. Not far. Q. You had to fall; you couldn’t hold on, with your foot under there, could you? A. Understand me, Judge; my foot got caught between the rail and guard rail, and I had hold. After my foot got caught, it pulled me back, and the flange could catch my feet. You can tell by my shoe that it was the flange that caught it. Q. Then your foot must have gone under? A. I held onto the train; I .knew that, if I turned loose, the train would run over me. Q. Then it would not have been caught in between the rail and guard rail? A. Yes, sir; it was.”
Redirect examination:
“Q. After you caught your foot in the flange, how far did the car go? A. I went on; I suppose it drug me 10 yards. Q. Then, after the flange struck your foot, your foot became loosened? A. Yes, sir. Q. And you dragged along with the car? . A. Yes, sir.”
We find it difiicult to understand the testimony of the plaintiff in several particulars; for instance, when he says:
*613 “I had pulled it [the pin] out, hut the train was still in motion; my intention in staying in there and holding the pin was so, when the engineer stopped the car, I could pull the pin out, and the car would have been cut off from the train on the side track. * * * I could have pulled it [the pin] out while it [the train] was in motion; it was possible, but, so long as they [the cars of the train] were coming back, it would have dropped back, and the cars would still have been connected.”
We fail to understand exactly why he remained, holding the pin, partly pulled out (as we infer) from its position in the couplers; but, assuming that some useful purpose was thereby subserved, it nevertheless remains that he must have been walking along in the middle of a standard gauge track, say 4 feet 8% inches in width, and he could not, while so walking, have had his foot caught between the guard and track rails, which were close together upon the extreme left side of the track. If, however, whilst walking in that position, he could, and did, get his foot so caught, he must inevitably have been thrown down, face forward, by reason of the pressure upon his back of the moving car behind him, and he could have had no difficulty in remembering a circumstance of that kind, or in remembering whether he tried to pull his foot out, and he could hardly have testified as he did:
“The way I understand it, my foot must have gotten fastened in the guard rail. * * * I can hardly tell [whether he tried to pull his foot out], I guess I must have pulled when the wheel ran over it.”
Again, the guard rail is, say 12 feet long, and curves slightly, with the convex side towards the track rail; the middle of it being about 1%, inches from the track rail, and the ends about 4 inches, and the forward axle of the forward truck of the car is set back about 2% feet (or possibly more) behind and beneath the forward end of the car. If, therefore, plaintiff’s foot had been caught between the two rails, and had been crushed within the narrow space by the flange of the wheel, bearing its part of the weight of the car, he could not, at the same .time, and whilst the car was moving forward, have been holding onto the coupling pin, nor, when he finally let go, could he have fallen upon the outside of the track, nor would there have been left to him any semblance of a foot, as is shown to have been the case.
The conductor testifies that he told plaintiff that he wanted the end car kicked onto the passing track, the language used being, “Kick one to the siding”; that he was then 200 or 250 feet to the eastward of plaintiff, and was standing on the south side of the passing track; that he saw plaintiff go through the motion of lifting the lever, and then go in between the ears; that he did not know whether he went between the cars because he found something wrong with the lever, or whether he had stepped on the brake beam, or whether the lifting joint was out of order; but that, when a man goes in between the cars and stays an unreasonable length of time, he always feels uneasy until he knows what is keeping him there, and is not satisfied until he sees him come out; that he heard no call from plaintiff, and gave him no order, after the first, to “kick one to the siding”; that the cars that were being handled were all box cars; that it is not usual for brakemen to go in between moving cars in order to couple or uncouple them; that he had given plaintiff no particular instructions about his work, because he seemed to have had some experience, and the witness assumed that he had from what plaintiff had told him; that he was about 150 feet distant from the point at which plaintiff came out from between the cars; and that “he came out all at once.”
The engineer testifies, in part, as follows:
“Brakeman Pete gave me a signal to back up, and while I was backing up he signaled me down, in other words, to stop, pulling up a lever, and, after pulling the lever, turned and went between the cars. This is the last I saw *615 until he jumped out from the cars on the ground. He fell on the ground. * * * One of his ankles was mashed — foot or something. There were four or five oars in the train, ail box cars.”
The two cars between which plaintiff entered were box cars; witness took their numbers ; plaintiff gave stop signal before he went between the cars, and witness immediately applied the brakes, and the train was stopped within about a car’s length. It was not habitual for brakemen to go between moving cars in order to couple or uncouple them; witness had never seen it done during his employment with defendant. Witness did not hear the voice of the conductor, or any voice, giving instructions to plaintiff.
There were two witnesses who testified that they saw plaintiff whilst he was between the cars, that he caught the grabiron on one of them, and put his foot against the coupler in order to make it match, and couple with the other coupler, and that his foot was crushed between the two; and we are inclined to think that plaintiff’s foot was caught between the couplers, and not between the guard and track rails, though the testimony thus referred to is very much discredited by reason of other testimony given by the same witnesses which is at variance with the established or admitted facts. On the other hand, there was a negro boy whom defendant had brought down from Oklahoma as a witness in its behalf, but who was put on the stand by plaintiff, and who testified that he was on the top of one of two cars between which the accident occurred, and that he at one time, heard some one say, “Out the car out”; but he did not know who it was. But his testimony is so confused and conflicting that we find it impossible to determine how much of it to believe. It is shown that the “Rule Book,” issued by defendant for the instruction of its employés, contains a rule (No. 637) reading as follows:
“Employés are forbidden * * * to go between cars in motion to uncouple them or to follow other dangerous practices.”
And defendant’s “time-tables,” which are shown to have been always accessible to the employés, and with which plaintiff is shown to have been familiar, contained a similar rule, reading:
“Employés are forbidden to go between cars for the purposes of uncoupling or coupling, or adjusting a coupling apparatus, while the cars are in motion,” etc.
Plaintiff was examined concerning his acquaintance with the time-table as follows:
“Q. Did you ever see a time-table of the Frisco line, while you were working, showing the schedule of the trains? A. Yes, sir; I think I have. Q. Did you ever look through one? A. Yes, sir; I guess I did; I must have. Q. Can you read print? A. Some; yes, sir. Q. Did you ever see a time-table like this document I show you? A. I don’t know whether it was like this or not; I don’t remember. Q. Do you know what is in those time-tables? A. Some; yes, sir.”
Opinion.
The admitted facts that plaintiff had worked for three years as station porter, that, for months before he was regularly employed as brakeman, he had repeatedly applied for that position, and had been qualifying for it by filling the places of regular brakemen who “laid off” for a day, now and then, and that he had been employed as a regular' brakeman for five or six weeks before the accident, are strongly corroborative of the testimony to the effect that he was seen studying the Rule Book; and all of those facts, coupled with his admission in regard to his knowledge of the contents of the timetable, satisfies us that he knew of the existence of the rule prohibiting brakemen from going between moving cars to couple or uncouple them. More than that, we have his specific admission that he knew that it was dangerous, and would not have gone between *617 the cars, as he did, if he had not been so ordered by the conductor. The conductor however, denies that he gave any such order, and he is corroborated by the engineer; and the testimony of the plaintiff, to the contrary, finds but little support in the confused testimony of the negro boy. That being the case, when plaintiff found that the lever was disconnected from the coupling pin, his plain and proper course was to wait until the train stopped, when the upcoupling could have been effected without danger; and his going between the cars while they were still in motion was uncalled for, and was the unnecessary assumption by him of a known risk, the consequences of which cannot properly be visited upon the defendant.
The judgment appealed from is accordingly affirmed.
PROVOSTY, J., being absent on account of illness, takes no part.